Filed 5/15/14  P. v. Inga CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063729 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD236182) |
| FRANK WILLIAM INGA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Leo Valentine, Jr., Judge.  Modified in part; conditionally reversed in part with directions.

Law Office of Allison H. Ting and Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Peter Quon, Jr., and Randall David Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

A jury found Frank William Inga guilty of two counts of oral copulation with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b))[1] (counts 1 and 2), one count of a forcible lewd act upon a child under the age of 14 years (§ 288, subd. (b)(1)) (count 3), and two counts of lewd acts upon a child under the age of 14 years (§ 288, subd. (a)) (counts 4 and 5). With respect to counts 4 and 5, the jury found that Inga engaged in substantial sexual conduct within the meaning of section 1203.066, subdivision (a)(8).

The trial court sentenced Inga to an indeterminate term of 15 years to life on count 1, plus a concurrent indeterminate term of 15 years to life on count 2. In addition, the court sentenced Inga to a determinate term of 12 years, consisting of the midterm of eight years on count 3, plus consecutive one-third midterms of two years each for counts 4 and 5.

On appeal, Inga requests that this court review two sealed family court files in order to determine whether the trial court erred in refusing to order the disclosure of any "potentially exculpatory or relevant impeachment materials." Inga also contends that the trial court erred in failing to instruct the jury sua sponte that it was permitted to consider the witnesses' character for truthfulness. Inga further contends that the trial court erred in failing to exercise its discretion in denying his posttrial motion to relieve retained counsel

---

[1] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

and appoint substitute counsel. Finally, Inga maintains that the trial court erred in imposing a restitution fine (§ 1202.4, subd. (b)) and a parole revocation fine (§ 1202.45, subd. (a)) in the amount of $15,000 each, because the statutory maximum for each fine is $10,000.[2]

We have reviewed the sealed family court files and conclude that the trial court did not err in denying Inga's request for disclosure. We also conclude that the trial court did not commit reversible error in failing to instruct the jury sua sponte that the jurors were permitted to consider the witnesses' character for truthfulness.

We accept the People's concession that the trial court erred in failing to exercise its discretion in determining whether to grant or deny Inga's posttrial motion to relieve counsel and appoint substitute counsel. We conditionally reverse the judgment and remand the matter to the trial court with directions to exercise its discretion in considering Inga's request to relieve counsel and to appoint new counsel.

Finally, we conclude that both the restitution fine imposed pursuant to section 1202.4, subdivision (b) and the parole revocation fine imposed pursuant to section

---

[2]    In his opening brief, Inga also claimed that the trial court erred in failing to instruct the jury that battery (§ 242) is a lesser included offense of a lewd act upon a child under the age of 14 years (§ 288, subd. (a)) (counts 4 and 5). In addition, Inga raised a cumulative error claim based on this asserted error and the trial court's purported error in failing to instruct the jury that it was permitted to consider the witnesses' character for truthfulness. In his reply brief, Inga expressly abandoned the lesser included offense instruction claim and the cumulative error claim in light of the California Supreme Court's intervening decision in *People v. Shockley* (2013) 58 Cal.4th 400. (*Id*. at p. 402 [holding battery (§ 242) is not a lesser and necessarily included offense of lewd conduct with a child under 14 years of age (§ 288, subd. (a))].)

3

1202.45, subdivision (a) must be reduced from $15,000 to the statutory maximum of $10,000.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *The People's evidence*

1.   *The family*

Inga and V.R. lived together on and off for about seven years. They have two sons together, I.I. and F.I.  I.I. was born in July 2001.  F.I. was three to four years older than I.I.

Inga and V.R. broke up in approximately 2005.  After the break up, I.I. and F.I. lived primarily with V.R., while Inga had informal visitation with the boys.  F.I. and I.I. would generally visit Inga during school breaks at a residence that Inga shared with his parents, his brother, and his sister.

2.   *The shower incidents (counts 4 and 5)*

In 2007 and 2008, when I.I. was about six or seven years old, Inga took showers with I.I. and F.I.  During the showers, Inga would hit I.I. and F.I. in the face with his penis.  Inga's penis would touch I.I.'s face on his cheek and the outside of his mouth.

3.   *The bedroom incidents (counts 1, 2, and 3)*

In the summer of 2011, V.R. allowed I.I. and F.I. to spend a large portion of their summer vacations with Inga.  On July 18, 2011, F.I. left Inga's residence to go back to V.R.'s home.  I.I. continued to live with Inga for five additional days.  I.I. would often sleep in the same bedroom as Inga.

4

On several occasions during this time period, while everyone was asleep, Inga would lock the bedroom door, take off his pants and underwear and remove I.I.'s pants and underwear. Inga would lie on top of I.I. and put his penis on I.I.'s "butt." I.I. estimated that Inga put his penis on I.I.'s "butt" approximately "five times." On at least one of these occasions, Inga tripped I.I. and forced him to the ground before sexually assaulting him. Inga also would grab I.I. around the back of his neck, open I.I.'s mouth, and put his penis inside I.I.'s mouth. According to I.I., Inga put his penis in I.I.'s mouth on more than one occasion.

During some of these sexual assaults, I.I. told Inga to stop, but Inga put his hand over I.I.'s mouth and throat and continued to assault him until he heard another person in the house waking up. I.I. would also try to open the bedroom door to get out, but Inga would pull him away from the door.

I.I. stated that he did not initially tell anyone about the abuse because he was embarrassed. In addition, Inga often told I.I. not to tell anyone or Inga would hit I.I. in the face. I.I. also stated that he did not disclose the abuse because he was worried that Inga might hurt him if he did.

4.      *I.I.'s molestation of another child*

On August 9, 2011, V.R.'s sister, C. H., was babysitting I.I and taking care of her three-year-old son, E. At some point during the day, C.H. discovered that E. and I.I. were in a locked bedroom. C.H. went to the room and began to try and force open the door. Shortly thereafter, I.I. opened the door. C.H. saw E. standing on top of the bed with his pants and underwear down around his ankles. E. said that I.I. had been touching and

5

kissing E.'s "thing," touching E.'s behind, and rubbing his "balls" on E. C.H. was in shock. She had never seen E. engage in any kind of sexual behavior and had never heard him use the term "balls" before.

C.H. called V.R. When V.R. arrived, C.H. explained what had happened. V.R. began crying and yelling at I.I. I.I. initially denied molesting E., but then said that he learned the sexual behavior from Inga. V.R. immediately called the police.

5. *Interviews of I.I.*

On August 11, 2011, forensic interview specialist Lisa McCullough interviewed I.I. San Diego Police Detective Daniel Burow watched the interview through an observation window. During the interview, I.I. said that Inga had done some "nasty" things to him with Inga's "private parts" in Inga's bedroom, and that this had happened on more than one occasion. I.I. said that Inga told him not to tell anyone about the abuse or Inga would hit him. I.I. also stated during the interview that Inga hit I.I. and F.I. in the face with his penis in the shower on more than one occasion.

A few days later, Detective Burow conducted a tape-recorded follow-up interview with I.I.[3] I.I. told Burow that sometime in July 2011, Inga did "nasty stuff" to him in Inga's bedroom. According to I.I., Inga put his penis on I.I.'s "butt." I.I. told Inga to stop, but he would not. Inga told I.I. not to tell anyone or Inga would hit him. The following morning, Inga put his penis in I.I.'s mouth. I.I. tried to run out of the room, but Inga grabbed him by the throat. I.I. said Inga put his penis in I.I.'s mouth on six occasions.

---

[3] The People played an audio recording of the interview at trial.

6

With respect to the shower incidents in approximately 2007, I.I. explained that Inga would jump and laugh and put his penis in I.I.'s face and F.I.'s face. I.I. indicated this occurred on six to 12 occasions.

6.    *Expert testimony concerning child sexual abuse*

Palomar Health Center forensic health supervisor Catherine McLennan testified concerning the reasons why children who are victims of sexual abuse may delay disclosing the abuse. McLennan explained it is often difficult for children to disclose sexual abuse, particularly if the child has a close relationship with the abuser.

B.    *The defense*

Inga's sister, C.H., lived with Inga, another brother, and their parents. T.B. testified that I.I. and F.I. spent the night at the family residence occasionally from 2006 through 2010. T.B. never saw Inga shower with the boys after they were one or two years old. According to T.B., in 2010, I.I. often pulled down his pants to "show his butt" and would gesture to his private parts saying, "Suck it, suck it."

III.

DISCUSSION

A.    *The trial court did not err in refusing to order the disclosure of any portion of two sealed family court files*

Inga requests that this court review two sealed family court files pertaining to Inga, V.R., I.I., and F.I. to determine whether the trial court erred in refusing to order the

7

disclosure of any material evidence in the files.[4]  (Citing *Pennsylvania v. Ritchie* (1987) 480 U.S. 39 (*Ritchie*).)

1.      *Governing law*

In *Ritchie, supra,* 480 U.S. 39, the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment mandated that a state trial court review certain confidential records pertaining to a state child abuse investigation to determine whether the records contained favorable evidence material to guilt or punishment that should be disclosed to the defense.  (*Ritchie, supra,* at pp. 57-58.)  The *Ritchie* court explained that '[evidence] is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' [Citation.]"  (*Id*. at p. 57.)

2.      *Factual and procedural background*

During a pretrial hearing, defense counsel requested that the trial court examine the contents of two sealed family court files pertaining to a "custody battle" between Inga and V.R.  Defense counsel stated, "[T]here might be some relevant statements about custody based upon the family court mediation where they talked to the children."  Counsel added, "I would like for [*sic*] the statements being in there . . . ."  The court agreed to conduct an in camera review of the sealed files.

After conducting an in camera review of the files, the court stated:

---

[4]     In their respondent's brief, the People state that they have no objection to this court reviewing the sealed family court records.

8

"I did look at the files and you have asked me to take a look to see if there is anything relevant to this case. And to the extent that you say 'relevant,' there is [the] original disclosure I believe that was brought to the court's attention in Child Protective Services in which this matter is about. Other than that, pretty much routine custodial issues before the court. But nothing that has to do with allegations of molestation."

The prosecutor responded by noting that the defense had received separate Child Protective Services records pertaining to the incidents comprising the charged offenses.

The trial court then continued:

"Yes. And so I'm not sure what you consider relevant, [defense counsel], because, again, the court has not been provided with the defense's theory of the case. But family court—and it had to do with complaints of—I believe you had talked about physical abuse by one parent or the other. That, certainly, is part of the content of the file. The court's decision parameters, restrictions that the court placed on visitations are all part of the file. But again, nothing to do with this case."

Defense counsel replied, "That's fine."

3.      *Application*

We assume for purposes of this decision that the sealed family court records at issue in this case are analogous to the state child abuse investigation records at issue in *Ritchie*. We have reviewed the sealed files and conclude that the trial court did not err in determining that they do not contain any evidence material to Inga's guilt or punishment.

B.      *The trial court did not commit reversible error in failing to instruct the jury sua sponte that it was permitted to consider the witnesses' character for truthfulness in assessing their credibility*

Inga contends that the trial court erred in failing to instruct the jury sua sponte that it was permitted to consider the witnesses' character for truthfulness in assessing their

9

credibility. Specifically, Inga contends that the trial court had a sua sponte duty to instruct the jury pursuant to CALCRIM No. 226 that the jury could consider the witnesses' "character for truthfulness." (CALCRIM No. 226.)

We apply the de novo standard of review in determining whether the trial court had a duty to give a particular jury instruction sua sponte. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.[5]

1.      *Governing law*

    a.      *CALCRIM No. 226*

CALCRIM No. 226 provides:

> "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.
>
> "In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are:
>
> "• How well could the witness see, hear, or otherwise perceive the things about which the witness testified?

---

[5]      We reject the People's argument that Inga forfeited his claim by failing to request such an instruction in the trial court. Inga's claim on appeal is that the trial court had a duty to give the instruction sua sponte. Such a claim is not forfeited by defense counsel's failure to request the instructions at trial. (See, e.g., *People v. Tate* (2010) 49 Cal.4th 635, 697, fn. 34 ["The People claim forfeiture on grounds defendant did not request . . . [the] instruction below. We find no forfeiture because we understand defendant's argument to be that the court should have given such an instruction sua sponte"].)

10

"• How well was the witness able to remember and describe what happened?

"• What was the witness's behavior while testifying?

"• Did the witness understand the questions and answer them directly?

"• Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

"• What was the witness's attitude about the case or about testifying?

"• Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

"• How reasonable is the testimony when you consider all the other evidence in the case?

"• [Did other evidence prove or disprove any fact about which the witness testified?]

"• [Did the witness admit to being untruthful?]

"• [*What is the witness's character for truthfulness*?]

"• [Has the witness been convicted of a felony?]

"• [Has the witness engaged in [other] conduct that reflects on his or her believability?]

"• [Was the witness promised immunity or leniency in exchange for his or her testimony?]

"Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently.

"[If the evidence establishes that a witness's character for truthfulness has not been discussed among the people who know him

11

or her, you may conclude from the lack of discussion that the witness's character for truthfulness is good.]

"[If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject.]

"[If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest.]"  (Italics added.)

The Bench Notes to CALCRIM No. 226 state in part, "Give all of the bracketed factors that are relevant based on the evidence."

> b.       *The trial court's sua sponte duty to instruct the jury concerning the factors that the jury may consider in assessing the witnesses' credibility*

In *People v. Rincon–Pineda* (1975) 14 Cal.3d 864, 883–884 (*Rincon-Pineda*), the Supreme Court held that a trial court has a sua sponte duty to instruct the jury concerning the manner by which it may determine the credibility of witnesses, stating:

> "We deem it appropriate instead to reaffirm and reinforce the existing instructions as to the credibility of witnesses which must presently be given—at least in part (see Pen.Code, § 1127)[6]—sua sponte by the trial court in every criminal case.  Thus, the substance of the instruction set forth as CALJIC No. 2.20[7] should henceforth always be given, and while those paragraphs thereof inapplicable

---

6       Section 1127 provides in relevant part, "In charging the jury the court . . . may make such comment on . . . the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the case . . . .  The court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of the witnesses."

7       CALCRIM No. 226 largely tracks the language of CALJIC No. 2.20 concerning the factors that a jury may consider in assessing the witnesses' credibility.

under the evidence may be omitted, the paragraphs alerting the jury to the bearing on the credibility of a witness of the 'existence or nonexistence of a bias, interest, or other motive' and the attitude of the witness 'toward the action in which he testified or toward the giving of testimony,' should be given in any case in which the victim of the alleged offense has testified for the prosecution, regardless of whether specific evidence of any motive or disposition to misstate facts on the part of the complaining witness has been adduced by the defendant."

In *People v. Horning* (2004) 34 Cal.4th 871, 910, the Supreme Court summarized its holding in *Rincon–Pineda* by stating, "We have said that the court should give the substance of CALJIC No. 2.20 in every criminal case, although it may omit factors that are inapplicable under the evidence."

        c.    *The meaning of "character evidence" in assessing a witness's credibility*

In *People v. Long* (2005) 126 Cal.App.4th 865 (*Long*), the court considered whether a trial court had erred in refusing to instruct the jury pursuant to CALJIC No. 2.20 that "the jury could consider '[t]he character of the witness for honesty or truthfulness or their opposites[]' in judging the believability of a witness." (*Long, supra*, 126 Cal.App.4th at p. 871, quoting CALJIC No. 220.) The defendant in *Long* claimed that evidence pertaining to a witness's mental disorder constituted "evidence of her character for untruthfulness." (*Long, supra*, at p. 870.) The trial court refused to give the requested instruction on the ground that evidence pertaining to a witness's mental disorder was "not the type of evidence that this instruction is intended for." (*Id*. at p. 871.)

13

In concluding that no evidence of the witness's character for truthfulness had been presented at trial, the *Long* court defined "character evidence" as " '[e]vidence regarding someone's general personality traits; evidence of a person's moral standing in a community based on reputation or opinion.' [Citation.]" (*Long*, *supra*, 126 Cal.App.4th at p. 871.) The *Long* court concluded that evidence of the witness's mental disorder did not constitute "testimony of [her] character for untruthfulness." (*Id*. at p. 872.)

2.      *Factual and procedural background*

a.      *Relevant trial testimony*

V.R. testified that when I.I. was about six years old, she overheard F.I. and I.I. talking with their cousin about how Inga had "smacked [I.I.] on the face," with his penis. F.I. and I.I. told V.R. that "it was a lie."

F.I. testified that he had told V.R. that he had seen Inga hit I.I. in the face with his penis in the shower. F.I. said V.R. did not believe him because "she thought I was lying."

Defense counsel also asked F.I., "Do you remember telling the detective here that your mom didn't believe you because you lied about things?" F.I. responded in the affirmative, and explained that he lied about things such as how well he was doing in school. F.I. also stated that he and I.I. used to "lie a lot," and that such lying made it difficult for his mother to believe him. F.I. also admitted that he had also probably lied to his aunts, uncles, and his dad.

14

b. The trial court's modified CALCRIM No. 226 instruction

The court instructed the jury with a modified version of CALCRIM No. 226, concerning the factors that the jury could consider in assessing the witnesses' credibility.[8] The court's modified version did not include the bracketed factor, "What is the witness's character for truthfulness?" (CALCRIM No. 226.)

---

[8] The trial court instructed the jury pursuant to a modified version of CALCRIM No. 226 as follows:

> "And you alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.
>
> "And you may believe all or part or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.
>
> "In evaluating the witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are:
>
> "Again, how well could the witness see, hear, or otherwise perceive the things about which the witness testified? How well was the witness able to remember and describe what happened? What was the witness's behavior while testifying?
>
> "Did the witness understand the questions and answer them directly? Was the witness's testimony influenced by a factor such as a bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?
>
> "What was the witness's attitude about the case or about testifying? Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

15

3. *Application*

We assume for purposes of this decision that the trial court erred in failing to instruct the jury that it was permitted to consider the witnesses' character for truthfulness in assessing their credibility, in light of the evidence discussed in part III.A.2.a., *ante*.

An erroneous failure to instruct on one of the factors that the jury may use to assess witness credibility is evaluated under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [reasonable probability of a more favorable result in the absence of the error]. (See *People v. Murillo* (1996) 47 Cal.App.4th 1104, 1108 (*Murillo*) [concluding trial court's error in failing to instruct the jury concerning the jury's

---

"How reasonable is the testimony when you consider all the other evidence in the case? And did other evidence prove or disprove any fact about which the witness testified?

"Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. [¶] Also, two people may witness the same event, yet see or hear it differently.

"If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject.

"If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

16

evaluation of the testimony of a witness who provides willfully false testimony[9] is reviewed under *Watson*].)[10]

For the following reasons, we are confident that there is no reasonable probability that Inga would have received a more favorable result if the trial court had specifically informed the jury that it could consider the witnesses' character for truthfulness in assessing their credibility.

To begin with, nothing in the trial court's instructions suggested to the jury that it was *prohibited* from considering the witnesses' character for truthfulness in assessing their credibility. On the contrary, the version of CALCRIM No. 226 that the trial court provided to the jury informed the jury that in assessing the witnesses' testimony, it could "consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony," a factor that logically includes the witnesses' character for truthfulness. The court also instructed the jury that "in deciding whether testimony is true and accurate, use your common sense and experience." The instruction also specifically informed the jury that in assessing the credibility of a witness, the jury could consider whether a witness

---

[9]    The instruction at issue in *Murillo* stated, " 'A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars.' [Citation.]" (*Murillo, supra*, 47 Cal.App.4th at p. 1107, fn. 4.)

[10]    We reject, as unsupported by any authority or legal reasoning, Inga's contention that the trial court's failure to specifically instruct the jury that it could consider the witnesses' character for truthfulness deprived him of an instruction on his "theory of the case," and therefore was either reversible per se or reviewable under the standard of prejudice described in *Chapman v. California* (1967) 386 U.S. 18, 24.

had been truthful, stating, "[I]f you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that the witness says."

Further, defense counsel's closing argument focused heavily on attacking F.I. and I.I.'s credibility, including attacking their character for truthfulness. For example, counsel argued:

> "You know, even [I.I.'s] own mother told you that she doesn't trust [I.I.]. . . . [¶] Even [I.I.'s] own mother told you that she doesn't trust anything [I.I.] says. . . . How about his brother? What did [I.I.'s] brother[, F.I., ] tell you? We are two liars. We lie a lot. That is a practice that we have. And what are on the things that they lied about? The shower incident."

Counsel also argued, "What stands between a defendant's innocence [and] a jail cell is one accusing finger of a witness we know to be a liar . . . ." Counsel also stated, "Both kids say I'm a liar. That's what I do, I lie," and "[F.I.] admits that the two of them are two liars." Toward the end of his argument, counsel reiterated that I.I. was "a child who is known to be a liar."

The jury must have found I.I. and F.I.'s testimony credible, since it convicted Inga on all counts. We conclude that there is no reasonable probability that the result would have been more favorable to Inga if the trial court had included the character evidence factor in its CALCRIM No. 226 instruction. Inga's suggestion the jury may have been unsure of how to evaluate the evidence of past lies without inclusion of that factor lacks merit. The absence of this portion of the instruction did not preclude Inga from asking the jury to draw the commonsense inference that evidence that a witness had lied in the

18

past was relevant in assessing the witness's character for truthfulness, and ultimately, the witness's credibility. (See *Murillo*, *supra*, 47 Cal.App.4th at p. 1108 [trial court's error in failing to provide jury with instruction containing "commonsense principle for evaluating witness credibility" was harmless].)

Accordingly, we conclude that the trial court did not commit reversible error in failing to instruct the jury sua sponte that it was permitted to consider the witnesses' character for truthfulness in assessing their credibility.

C. *The trial court erred in failing to exercise its discretion in denying Inga's posttrial motion to relieve retained counsel and appoint substitute counsel*

Inga contends that the trial court erred in failing to exercise its discretion in denying Inga's posttrial motion to relieve his retained counsel and appoint substitute counsel for the purpose of investigating whether to file a new trial motion based on retained counsel's alleged ineffective assistance. The People concede the error, and request that the matter be remanded to the trial court to permit the court to exercise its discretion in determining whether to grant or deny Inga's motion.

1. *Governing law*

"The right of a nonindigent criminal defendant to discharge his retained attorney, with or without cause, has long been recognized in this state." (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 (*Ortiz*).) "A nonindigent defendant's right to discharge his retained counsel, however, is not absolute. The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it

19

is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citation] . . . ."  (*Ibid*.)

In *People v. Munoz* (2006) 138 Cal.App.4th 860, 869 (*Munoz*), the court held, "the standard enunciated in *Ortiz* for judging a defendant's request to relieve retained counsel applies in the postconviction setting."  The *Munoz* court noted that delay will often, but not invariably, be a reason for denying a posttrial motion to relieve counsel:

> "Most trials will not be as easily reviewed as this one, so delay and public expense will often be the primary reasons for denying motions to replace counsel posttrial.  The defendant must always be required to justify this additional expense to the satisfaction of the trial court, and such calls will always be within its broad discretion. Delay and public expense will militate for denial and we do not envision either a spate of such motions or a plethora of successful ones." (*Id*. at p. 868.)

The *Munoz* court further explained that while "the stage of the proceedings at which the motion is made could affect its timeliness," and that a "substantial delay in the administration of justice" (*Munoz, supra*, 138 Cal.App.4th at p. 867) will, "in many cases" (*id*. at p. 870) be a reason for denying such motions, the fact that a motion to relieve counsel has been made postverdict does not *necessarily* mandate its denial. Instead, a trial court faced with such a motion must exercise its discretion in determining whether any such delay outweighs the defendant's right to discharge retained counsel. (*Ibid*.)  The *Munoz* court also described the manner by which a trial court is to exercise such discretion:

> " '[A] court faced with a request to substitute retained counsel must balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution.  [Citation.]' [Citation.]  [Citation.]  Blanket generalizations about possible delay

20

will not suffice. 'To exercise the power of judicial discretion [in ruling on motion to relieve retained counsel], all material facts and evidence must be both known and considered, together with legal principles essential to an informed, intelligent and just decision.' [Citation.] Furthermore, 'The trial court . . . must exercise its discretion reasonably: "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." [Citation.]' [Citation.]" (*Id*. at p. 870.)

2. *Factual and procedural background*

On the date set for sentencing, the trial court indicated that it had received a letter from Inga. In the letter, Inga stated that a juror had seen him handcuffed and in chains by the elevator during a recess at trial and the court should have declared a mistrial, defense counsel failed to interview a juror who was crying as the jury returned from deliberations, and defense counsel refused to call certain witnesses to testify on Inga's behalf.

In response, defense counsel stated, "My request is . . . to continue the matter on [Inga's] behalf and have the court to appoint another lawyer to look into . . . the issues that [Inga] has raised in the letter, to see if they would rise to the level of grounds for a new trial."

The court responded, "I'm not sure if there is any provision for the court to relieve you as counsel and appoint counsel to review whether or not there is a basis for filing a motion for new trial."

After further discussion with the prosecutor and defense counsel, the trial court clarified, "[T]here is a request for an appointment of an attorney [as to] whether or not there is ineffective assistance of counsel." Defense counsel responded in the affirmative.

21

The court continued by stating, "There is [*sic*] no legal grounds for the court to grant [the] motion." After discussing briefly the complaints outlined in Inga's letter, and confirming that defense counsel had been retained, the court stated, "[T]he court does not find [that] there is a legal basis to relieve counsel . . . ."

3.      *Application*

It is clear from the trial court's comments quoted above that the court did not believe it had discretion to grant Inga's request to relieve retained counsel and appoint substitute counsel. As the People properly concede, "rather than exercise its discretion, it appears the court mistakenly believed it had no such discretion." Thus, the matter must be conditionally reversed and remanded to the trial court in order to permit the court to properly exercise its discretion in determining whether to relieve retained counsel and appoint new counsel to investigate whether to file a new trial motion based on retained counsel's alleged ineffective assistance. On remand, in determining whether to grant Inga's request, the trial court should exercise its discretion in accordance with the factors outlined in *Munoz, supra*, 138 Cal.App.4th 860.[11]

_____

[11]     Because Inga seeks to have counsel appointed, it is his burden on remand to demonstrate indigency. (See *Schaffer v. Superior Court* (2010) 185 Cal.App.4th 1235, 1245 [concluding trial court did abuse its discretion in denying defendant's motion to abate discovery charges because defendant failed to "demonstrate that he was indigent" and stating, "[a] criminal defendant *who has established his indigent status* is constitutionally entitled to those defense services for which he demonstrates a need"].)

22

D.    *Both the restitution fine imposed pursuant to section 1202.4, subdivision (b) and the parole revocation fine imposed pursuant to 1202.45, subdivision (a) must be reduced from $15,000 to the statutory maximum of $10,000*

Inga contends that the trial court erred in imposing fines pursuant to sections 1202.4, subdivision (b) and 1202.45, subdivision (a) in the amount of $15,000 each. Inga contends that the fines are unauthorized and must be stricken because the statutory maximum for each fine is $10,000. The People concede that $10,000 is the statutory maximum for each fine, but contend that the fines must be reduced to the statutory maximum rather than stricken.

The statutory maximum for each fine is $10,000. (See §§ 1202.4, subd. (b) [authorizing the imposition of a restitution fine of "not more than ten thousand dollars ($10,000)"]; 1202.45, subd. (a) [mandating, in every case in which a defendant's sentence includes a period of parole, the assessment of a parole revocation fine "in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4"].)

We agree with the People that when a trial court imposes restitution and parole revocation fines in excess of the statutory maximum, the proper remedy is to modify the judgment to reduce the fines to their statutory maximum. (See *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1524 ["The $20,000 restitution fine imposed on Blackburn was in excess of the statutory maximum. We will modify the judgment by reducing the fine to $10,000"]; cf. *People v. Smith* (2001) 24 Cal.4th 849, 853 ["the Court of Appeal may correct the erroneous amount of the parole revocation fine in this case"].)

23

IV.

DISPOSITION

The judgment is modified to reduce the restitution fine imposed pursuant to section 1202.4, subdivision (b) and the parole revocation fine imposed pursuant to section 1202.45, subdivision (a) from $15,000 to $10,000.

The judgment is conditionally reversed and the matter is remanded to the trial court with directions to exercise its discretion in considering Inga's request to relieve counsel and to appoint new counsel to investigate whether a new trial motion should be filed based on retained counsel's alleged ineffective assistance.

If the trial court denies Inga's request to relieve retained counsel, the court shall reinstate the judgment.

If the trial court grants Inga's request to relieve counsel, the matter shall proceed from the point when Inga sought to discharge his attorney, just prior to sentencing.


_____
AARON, J.

WE CONCUR:


_____
NARES, Acting P. J.


_____
IRION, J.

24